## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TAMMY L. CALEF,**
      **Plaintiff,**

**V.**                                    **CIVIL ACTION NO: 1:06-CV-47**

**FEDEX GROUND PACKAGE SYSTEM, INC.,**
      **Defendant.**

### MEMORANDUM  IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

### I. STATEMENT OF FACTS

In the Spring of 1994, Tammy Calef, a welfare recipient and single mother of two infant daughters graduated from Fairmont State College with a degree in Business Administration - Marketing, a minor in Office Administration and a 3.51 GPA.  Ex 1 & 2.  On August 1, 1994, Ms Calef obtained her first full-time job after graduation with RPS (Defendant's direct predecessor) as a Package and Delivery (P&D) Operations Coordinator - Trainee.  Ex 3.  Ms. Calef was an excellent employee and rapidly advanced. By May 4, 1997, Ms. Calef was an Operations Coordinator IV.  Ex. 3.

Tammy Calef's advancement did not end with P&D. Rather, on April 19, 1999, she was promoted to Sales Representative. Ex. 3.  One year later, she was promoted to Account Executive.  On or about June 1, 2000, the Defendant FedEx purchased RPS.  Ex. 3.  As of April 9, 2003, Ms. Calef's earnings totaled $71,709.23. Ex 4.

In or about the Spring of 2003, Ms. Calef learned that the Defendant wanted her to relocate to Pittsburgh, to take on a more challenging sales territory. Calef Depo., 47.  Ms. Calef was concerned about relocating because her daughter was in school and her father was quite ill. Accordingly, "I chose to stay at home and take care of [them]." Calef Depo., 48.

About this time, Ms. Calef learned that the Defendant was seeking a replacement for the Senior Manager (Terminal Manager) (TM) of the Clarksburg Home Delivery (HD) Terminal. Calef Depo. 47.  The Defendant, a federal contractor, is required by a federally mandated affirmative action program to hire women.  Lyle Depo 121-124.  She decided to pursue the position, although it meant a significant reduction in pay[1] and even though the terminal was a mess. Calef Depo., 47.  Before accepting the job, Ms. Calef advised both Steve Hickman (the Regional Human Resource Manager) and Ken Kibler (the Regional Senior Manager) that: "it would take at least a year to get this terminal back on track." Ex. 7.

The previous TM, Jimmy Barnes, had been terminated, on April 12, 2003, because of integrity issues.  More specifically, Mr. Barnes was fired because he did not charge the FedEx contractor drivers[2] for vehicle rental costs and fuel costs, as all the contractors would quit if he did so.  Ex 8.

Mr. Barns was prescient. When Ms. Calef entered the Clarksburg HD terminal as its TM, on April 29, 2003 (Ex. 9), the terminal had lost three contracted routes because of contractor resignations. Burns Depo. 88; Ex 10 (FXG/Calef).  Within four days of Ms. Calef taking over the terminal, a fourth contractor quit for "financial reasons." Burns Depo. 96; Ex 11.  As a result, Ms. Calef was forced to provide service in the same geographic region with only 55% of the

---

[1]Ms. Calef's base salary as a TM was $53,915 plus incentives which capped her salary at $62,000. Ex. 9.  Ms. Calef was additionally compensated by way of the FedEx "Hidden Paycheck." Ex 5. Ms. Calef's "Hidden Paycheck" included both short-term and long-term disability benefits which she earned and/or contributed to before receiving the same between February 2004 and February 2006. Ex. 6.

[2]The Defendant does not hire any delivery van drivers.  Instead, drivers are either independent contractors or Adecco temp firm drivers.  Burns Depo., 50-51.

contract drivers that her predecessor had employed.[3]   Burns Depo. 97; Calef Depo. 48-49.

More succinctly, Ms. Calef was presented with the herculean task of righting a dysfunctional/dishonest terminal while at the same time attempting to provide service via a terminal virtually devoid of the requisite personnel.  Unfortunately, it is very difficult to locate and contract contractor drivers in West Virginia.  This is due in large measure to the very significant number of individuals who, although willing to contract, are unable to satisfy the financing requirements.  Hickman Depo., 127; Angstadt Depo., 144-145.

Long before Ms. Calef arrived at the terminal, Regional FedEx staff entered the building in an attempt to begin the turn-around:

> Q. After Mr. Barnes was terminated, what happened . . . in terms of regional people coming in,.  Were there a lot of people coming in? Were there a lot of people coming in at that point in time?
> A. There was a lot of support.
> Q. And why was that?
> A. We were down contractors for one, and we were trying to recruit contractors, drivers.
> Q. And this was true before Me. Calef started?
> A. Yes.

Davis Depo., 34-35.  Despite this regional support, the terminal continued to flounder.  On April 28, 2003, the day before Ms. Calef assumed her duties as the TM, the "Real Local Inbound Service Level" - the measure of service provided by a terminal to its customers - was only 71.4%.  Ex 12.  Moreover, the "Total Operating Costs per Package" was, purportedly, $8.24. Ex. 13.

The terminal lay flat on its back throughout the summer and early fall of 2003.  Two more original Barnes contractors abandoned their routes – each was subject to investigations for integrity issues.  Another Barnes contractor was terminated because he was a convicted felon.

---

[3]When Ms. Calef became TM there was only one temp driver in the "pipeline." Ex 12.

3

Finally, Tom Doak, a contractor hired by Ms. Calef, quit his route for personal and financial reasons. Ex 14; Burns Depo 184-195; Ex 15.

From May thru August 2003, not a single package handler quit under Ms. Calef's stewardship.  In September 2003, Ms. Calef experienced a package handler turn-over rate of 81%.  In the month of October, package handlers quit the terminal at the rate of 157.58%.  These turn over rates were well below the Defendant's goal of 190%. Ex 13.  Throughout her tenure, not a single staff person left Ms. Calef's employ.  And although her contractor turn over rate was high, recently produced documents reveal that her male successor's rates were equally high or higher, through at least February 2004. Ex 13.

Sometime in August 2003, Ms. Calef requested and received assistance from a "Corporate Regional Operations Manager (ROEM)." Ex. 7.  The ROEM, Jeff Sens, arrived in the terminal, on or about August 29, 2003.  Mr. Sens was in the terminal for two days. Ex. 16.  Mr. Sens prepared a report of his findings.  Of note, he observed: (1) that there was an engineering problem associated with a shuttle for packages from another terminal; (2) that at least ten separate work areas (contractor delivery routes) were needed to service the delivery area; (3) that the FedEx scanning and mapping system [VRP], used to locate addresses for delivery, was ineffective for the service area; (4) that because the VRP was ineffective and could not map directions to addresses, there was an "area knowledge learning curve" [a learning curve for the geographic location of addresses], therefore it would take time for new contractors and temporary drivers to learn, through trial and error and experience, address locations; and, (5) that as a result of that "area knowledge learning curve" it would take time to get terminal service back to acceptable levels. Ex. 16.

On September 3, 2003, the FedEx Regional Senior Manager, Scott Burns, hosted a Quarterly Roundtable Meeting at the Clarksburg terminal.  The purpose of the Roundtable is to discuss terminal operations with the contractors. Burns Depo. 154-155. Ex 17.

In its "Review of Operations/Sales" section, the Roundtable Report declares that "Business is coming back - Peak [Christmas delivery season] is right around the corner. Resources in place to get the facility contracted." Ex. 17.  Obviously, this is a pronouncement of improvement for the terminal.  More specifically, "resources in place to get the facility contracted" is a reference to temporary drivers. Burns Depo120.  Accordingly, the Roundtable Report indicates that temporary drivers had been located.  The Roundtable ended with "glad to see facility getting contracted." Ex 17.

By September 10, 2003, the new temporary drivers were processed and assigned routes. The result, 9 delivery routes were now covered by contractors and temporary drivers, Ex 18.  By September 23, 2003, there were 5 contracted routes and a field of 6 temporary drivers in the "pipeline," in the event that any of the contractors should terminate. Ex 19.

As Mr. Sens predicted, in his August 30 report, service remained at unacceptable levels while the new drivers learned the physical locations for package addresses.  The terminal's "Real In Bound Local Service" for the month of September was 87.2%. Ex. 12.  Nonetheless, a significant improvement from the April 28, 2003 level of 71.4% and May 2003 level of 76.2%. In addition, the September total operating expense per package had fallen from its July high of $10.948 per package to $9.470. Ex 14.

On August 5, 2003, Lynn Angstadt, the FedEx Division Human Resource Manager for staffing was apparently visiting the Clarksburg HD Terminal.   On this date it is evident that the

5

Manager of the FedEx Operations College was attempting to communicate with Ms. Calef regarding her training needs. As Ms. Calef was conducting a "Contractor Review," Ms. Angstadt responded on Ms. Calef's behalf and exclaimed: "Too many people have been down here telling them their way and not necessarily the right way." Ex. 20.

Given Ms. Angstadt's exclamation, it is not surprising that Ms. Calef began to assert her authority as the TM of the terminal, as any man would do, in an effort to set the terminal "back on track." Accordingly, she began by respectfully informing the Regional Senior Manager Ken Kibler, his regional staff – all those people who had been in her building since before she arrived – that scanning procedures, route configurations, and release procedures, should be done in accordance with her plans, rather than theirs (Calef Depo 116-117):

> I wanted it done the way I had it planned out. Because in previous times I had done it their way and it failed. So now I wanted to try - - that's what I was hired for here. I want to do it this way.

Calef Depo., 117. Mr. Kibler did not respond very nicely. Calef Depo 118. Ms. Calef explained:

> When there would be - - other male terminal managers approached the Regional Director, whether it be Ken Kibler or Scott Burns, and come up with something and they'd be assertive, no problem.

Calef Depo 125.

Ms. Calef continued to assert her authority over the terminal through August 2003, including calling in the ROEM, Mr. Sens, for expert assistance so that serious dock problems might be properly assessed and rectified rather than accepting the *ad hoc* decisions of all those too many people who had been telling her "their way and not necessarily the right way." She took charge of the terminal right into September. However, sometime in September, Ms. Calef had a disagreement with Steve Hickman, the Regional Human Resource Director, about staffing

and recruitment.  The disagreement centered upon her request that Mr. Hickman recruit package

handlers because she was tied up recruiting contractors.  Mr. Hickman refused.  Ms. Calef asked

him: "Then why are you here?  Scott Burns told me you were here to help me." Calef Depo 120.

After this less than pleasant discussion, Ms. Calef telephoned Scott Burns (Ken Kibler's

replacement) and asked him if she could "vent."[4]  Ms. Calef then advised Mr. Burns of the

"reality of the 'help' the regional staff had been giving me." Ex 7.  After her conversations with

Messrs. Hickman and Burns: "Everybody left when everything changed . . . And I actually got to

start doing what I wanted to do within the terminal." Calef Depo. 206.

When Ms. Calef was left to her own devices, the terminal began to improve.  A FedEx

Corporate Engineer [not to be confused with Regional Engineer], Paul Born, visited the terminal

on September 17 and 18, 2003. Ex 21.  His report notes the increased efficiency of the terminal

dock operations: "90% improved from last visit - dispatch 1.5 hr. earlier." Ex. 21.  Mr. Born

further reported that packages were being processed at the rate of 1000/hr - "Thruput was good at

1000/hr and pallet stacking was orderly, again much improved over last visit."  Moreover, the

Born report notes that: (1) office layout was improved; (2) flexing was reduced; and, (3) "QA[5]

improved: 14 packages in QA, down from 50 last visit." Ex 21.

By mid October 2003, the Clarksburg HD terminal is really starting to turn around.  By

October 17, 2003, Ms. Calef is servicing her area with 5 permanent contractors and 9 temporary

---

[4]When Ms. Calef addressed Mr. Burns from this "flat frame of reference" he most likely
perceived her as a threat to his authority. *See* Lyle Depo. 9-12.

[5]"QA" stands for "Quality Assurance," a..k.a. "the cage."  When an address for a package cannot
be located a post card is mailed asking for directions. Until the directions are received, the package is
kept in "the cage" to protect it from theft, loss, or damage.  As the number of packages in the QA is down
Ms. Calef and her staff are beginning to surmount the VRP system inefficiencies.

drivers. Ex. 22.  On the "Weekly Terminal Ranking Report" the terminal has moved from dead

last (24th) or second to last (23rd) Ex. 23.  And, the "Daily Service Planning Work Sheet" for

October 17, 2003 shows contractor service at 95.9%. Ex 22.

On October 24, 2003, the contractors demonstrated additional improvement.  Contractor

service was 97.1%.  Ex 24.  More importantly, for the week ending October 25, 2003, the

terminal was ranked 12th among the 24 regional terminals. Ex 25.  Moreover, the "Terminal

Trends" reveal that the terminal's "Real Inbound Local Service" for the month of October 2003

averaged 97.2%, up a full 10% from September's number and up more than 20% since the day

before Ms. Calef took over the terminal. Ex. 13.

From April 29, 2003 thru September 15, 2003, Ms. Calef did not receive a single written

complaint concerning her operation of the terminal.[6]  On September 18, 2003, an E-mail was

forwarded to Ms. Calef from Paul Molnar regarding an error she made in permitting two

contractors to drive their own vans, under the Clarksburg HD number, rather than rental vans.

Ex. 27.  Ms. Calef apparently corrected the error as Mr. Molnar did not make complaint, again.

From September 3 thru September 13, 2003, Desha Smith, an "Operations Manager"[7] for

Home Delivery, was sent to the Clarksburg Terminal to train Ms. Calef on "office administration,

our processes, as [Ms. Smith] was taught in another terminal." Hickman Depo. 68. The report of

---

[6]Note should be made that a "Terminal Visit Action Item," dated August 27-29, 2003, with
follow-up dates of August 29 and September 9, 2003 is within the Defendant's production.  This
document, however, was not created by Steve Hickman until September 28, 2003.  See Ex. 26 (*See* lower
left-hand corner "C:\ Temp\QCLB 9-28 Visit Doc.). Ms. Calef never received this document. See Ex 9.

[7]An "Operations Manager" has "every responsibility that a terminal manager has. They are a
terminal manager . . . Desha Smith ran the Home Delivery Operation as Tammy Calef would run the
Clarksburg Operation." (Emphasis added) Hickman Depo 116.

Ms. Smith's training visit was never shared with Ms. Calef. Ex 28.  Instead, Steve Hickman sent

a September 19, 2003 memo in which the "training visit" was reformulated into "Clarksburg

Action Items" (administrative failures). Ex. 29.  There is no documentary evidence of record that

Ms. Calef did not carry out the "action items" addressed, therein.

On or about October 15, 2003, Steve Hickman contacted Chris Davis (the Service

Manager working under Ms. Calef) and asked him to send an e-mail concerning Ms. Calef.  Mr.

Davis complied and, on October 15, 2003, made various complaints about Ms. Calef's

management style. Ex. 30.  This e-mail was never shared with Ms. Calef.

Also, on October 15, 2003, Mr. Hickman, on behalf of himself and Scott Burns, wrote to

Lynn Angstadt "seeking [her] approval to replace Tammy as Senior Manager in Clarksburg,

WV." Ex 31 (FXG/Calef 0216).  Why Mr. Hickman and Mr. Burns sought the approval of this

Divisional Human Resource Manager (Ms. Angstadt) remains a mystery. Burns Depo 203.

The purported rationale for this adverse employment action was that "despite extensive

training and support . . . Tammy has been unable to make an impact on the terminal.  Contractor

and employee relations has suffered as evidenced by the contractor turnover summary enclosed."

Ex 28.  Although undersigned counsel remains uncertain as to exactly what documents were

attached to this memo, as witnesses cannot recall, it appears that the following documents were

attached: (1) the Davis October 15, 2003 e-mail (Ex 30); (2) contractor turn over calculations of

231% from June 1, 2003 - October 15, 2003, authored by Steve Hickman (Ex 32);[8] (3) a list of

---

[8]The 231% figure is contrary to the Terminal Trends figure. See Ex 13.

regional staff visits, authored by Steve Hickman (Ex 33);[9] and, (4) the September 13, 2003

"Clarksburg Action Items," authored by Steve Hickman. Ex. 29.

On October 25, 2003, Scott Burns, Steve Hickman and Lynn Angstadt arrived at the

Clarksburg terminal, unannounced, and informed Ms. Calef that she was being demoted to a

Service Manager III.  Calef Depo 61-64.  On October 27, 2003, Lynn Angstadt purportedly e-

mailed herself, and blind copied Steve Hickman, a memorandum concerning Ms. Calef's October

25, 2004 (sic) demotion. Ex 34.  The memorandum indicates that Ms. Calef was demoted

because: (1) the terminal was not fully contracted; (2) the terminal's service was below goal; and,

(3) the terminal's financials were negative.  The memorandum also advises that Ms. Calef's male

successor would takeover operations of the terminal, on Tuesday, October 28, 2003 and that a

FedEx Performance Improvement Plan (PIP)[10] was not an option because Ms. Calef purportedly

could not "raise the service and get contracted in the time allotted."Ex 34.

On October 28, 2003, Ms. Calef was replaced by Kyle Ryan. [11]  Accordingly, Mr. Ryan is

---

[9]Steve Hickman created the document and apparently attached it to the October 15, 2003 memorandum to Lynn Angstadt so as to prove the "extensive training" Ms. Calef received. **However, Mr. Hickman does not know on which day there was training, what was trained, or even if training occurred**. Hickman Depo 64-65.

[10]The FedEx Performance Management Program (PMP) holds that "all employees have a right to know exactly how they are performing against the standards expected of them . . . In other words, it should not take six to twelve months for employees to learn of a problem." Ex 35.  Accordingly, FedEx has developed a Performance Improvement Plan (PIP) Process.  This process can be initiated at anytime and is designed to identify problems, inform the employee of those problems, and afford them an opportunity to correct those problems. Ex 36.

[11]Before his promotion to the Clarksburg HD terminal, Mr. Ryan was a Service Manager I at a FedEx Cincinnati, B-1 facility, for only 17 months. Ex 37.  In order to be hired as a Service Manager I, Mr. Ryan was required to have a Bachelors Degree. Ex 38. In his resume, Mr. Ryan claims he attended the United States Naval Academy from 1997 thru 1999. Ex 39.  Mr. Ryan testified: "I graduated from the University of Cincinnati" Ryan Depo. 7. Neither claim is true.  Mr. Ryan never attended the United States Naval Academy. Ex 40.  Mr. Ryan never graduated from the University of Cincinnati. Ex 41.

a direct male comparitor to Ms. Calef.  Application of the three rationales articulated for Ms.

Calef's demotion, to Mr. Ryan's performance as a TM, reveals that Ms. Calef's demotion

resulted from classic mixed-motive sex discrimination.  First, the evidence establishes that at

least as late as August 31, 2004, Mr. Ryan was not fully contracted and he had insufficient

temporary drivers in the "pipeline." Ex 42.  Second, Mr. Ryan's "Real Inbound Local Service"

remained below the FedEx 98% goal, through at least February 2004. Ex 13.  Moreover, Mr.

Ryan failed to meet Real Inbound Local Service goals through September 2004, even though

FedEx reduced that goal to 96%, at some point prior to June 2004. Ex 43.  Third, Mr. Ryan's

financials remained in the negative through at least May 2005. Ex 43.  Fourth, Mr. Ryan's

contractor turn over rate, according to  FedEx Terminal Trends reports, was 200%, 173.33%,

189.02%, and 133.33%, respectively, for November and December 2003 and January and

February 2004. Ex 13.  In addition, Mr. Ryan continued to turn over contractors at a higher than

goal rate for the fiscal year 2005. Ex 44.

An additional male comparitor to Ms. Calef is Tim Means.  Mr. Means was the HD

Terminal/Operations Manager in Erie.  Mr. Means had serious performance issues identified at

least as early as July 11, 2002.  These problems included, but were not limited to, issues with

accountability and integrity, service levels, inaccurate reporting of service levels, un-contracted

delivery routes, and recruiting failures.  One year after these issues were identified, on July 31,

2003, Mr. Means was placed on a PIP allowing him 30 days in which to improve.  On December

11, 2003, he was evaluated by Scott Burns, the same Senior Manager to whom Ms. Calef

reported.  Before evaluating Mr. Means, Mr. Burns reviewed his personnel file, therefore he must

necessarily have know that Mr. Means was subject to the July 31, 2003 30-day improvement

plan.  Mr. Burns found Mr. Means' performance to be well below expectations.  Mr. Means "Total Yr [Year] Actual" "Real Inbound Local Service," when accurately calculated for Fiscal Year 2004, was 55.2%.  Nonetheless, Mr Means was not terminated as TM, until April 21, 2004. Ex 45; Burns Depo 225-234.

On October 28, 2003, Ms. Calef began her career as a Service Manager III.  Because Clarksburg historically had only one Service Manager, she and Chris Davis, a Service Manager I, split duties.  Davis Depo 24.  Ms. Calef worked the Dock and Mr. Davis worked P&D. Ex 34.

The job description in effect during Ms. Calef's tenure as a Service Manager III includes no lifting requirements.[12]  The fact that the job description does not include any lifting requirements is consistent with both Ms. Calef and Mr. Davis' description of the job – both Dock and P&D. Calef Depo 66; Davis Depo 8-12.  Furthermore, with the possible exception of "Peak" (Christmas), a Service Manager should not deliver packages. Ex 47.[13]

With the exception of the continual insult of Mr. Ryan "always putting Mr. Davis in charge," although Ms Calef was more senior (Calef Depo 133), Ms. Calef experienced no difficulties at work, until on or about January 23, 2004.  On January 23, 2004, when Ms. Calef arrived at work, Mr. Ryan informed her that "Steve Hickman would be calling.  He [Hickman] had written up an expectation plan, that they were switching me [from Dock] to P&D Service Manager." Calef Depo 78; *see* also Ex 49.  When he called, Mr. Hickman advised Ms. Calef that

---

[12]The Defense Expert classified the Service Manager III position as DOT 184.167-042 which describes a sedentary position. Ex 46 (*See* DOT trailer "Strength: S"); Evans Depo.

[13]*See* also Scott Burns Depo 11-12.  The only witness to describe heavy lifting for Service Managers was Kyle Ryan. Ryan Depo 80-8. Mr. Ryan has serious credibility issues. *See* Footnote 11, *supra*.  Also, the only job descriptions produced that require heavy lifting by a Service Manager were created on June 1, 2006, post-suit.  Ex 48.

she would be required to sign a performance expectation plan because of the change in position. **Although Mr. Davis switched positions, as well, he was not required to sign a performance expectation plan**. Calef Depo 123-124; Davis Depo 71 & 89.

Even though the switch was not to take effect until March, 2004, Ms. Calef was immediately placed in P&D. Ex 50.  On January 24, 2004, Ms. Calef injured her left hand while playing volley ball. Calef Depo 84.  Initially, the injury seemed inconsequential – it was not broken. Calef Depo 85.  When Ms. Calef reported to work with this injury, rather than having her perform her P&D Service Manager duties, Mr Ryan ordered her to deliver packages, as if she were a van driver. Calef Depo 85-86.

On or about February 6, 2004, Steve Hickman arrived in the terminal. When he arrived, Ms. Calef was loading a van, as Mr. Ryan still had her delivering packages instead of her P&D duties.  Mr. Hickman approached Ms. Calef and asked whether she had been sending out resumes.  Ms. Calef told Mr. Hickman that she was not sending out resumes; she was not looking for another job.  Mr. Hickman then offered her a severance package if she would quit.  Ms. Calef let Mr. Hickman know that she was not quitting and that she intended to retire with FedEx. Calef Depo 198-199.  Having ascertained that Ms. Calef was not going to voluntarily quit, Mr. Hickman, once again, apparently contrived to create documentation that might result in her dismissal.  In this regard, he e-mailed Ms. Angstadt and advised: "Cleaned up a few things.  Will discuss with Kyle." Ex 51. Although dated 2/12/04 thru 2/13/04, given Mr. Hickman's e-mail, it is reasonable to infer that notes created by Mr. Ryan, concerning Ms. Calef, were the "few things" Mr. Hickman cleaned up, on February 12, 2004. Ex. 52.

After a few weeks of delivering packages, rather than performing her more sedentary

13

duties as a Service Manager, Ms. Calef's hand became much worse.  She went to Mr. Ryan and

told him that she could not continue to deliver packages because of her injury.  Even though

delivering packages was neither a part of her job description (Ex 41), nor included within her

Performance Expectation Plan (Ex 44), Mr. Ryan required Ms. Calef to obtain a "doctor's

excuse" to prove that she was unable to perform the work of a van driver.

On February 16, 2004, Ms. Calef was seen by Kelly Nelson, MD.  On that same day, Dr.

Nelson imposed exertional limitations: "Limited use of [left] hand - no lifting [greater than] 20

[pounds]. Ex 53.  In addition, Dr. Steven Pinti restricted the amount of driving Ms. Calef could

do. Ex 54.  Ms. Calef gave the "doctors' excuses" to Mr. Ryan.  Mr. Ryan sent Ms. Calef back

out on the road, delivering packages. Calef Depo 89.  Both "doctors' excuses" were faxed to

Steve Hickman, on February 17, 2004. *See* Ex 53 & 54.

On February 20, 2004, Ms. Calef returned to her doctor.  She was placed in a half cast.

Her physician penned yet another "excuse" for FedEx.  This excuse advised that Ms. Calef was

not to use her left arm, until March 20, 2004. Ex 55.  Mr. Ryan knew that Ms. Calef could no

longer be forced to deliver packages with a half cast on her arm.  As a result, Ms. Calef was

finally able to perform the sedentary duties of her Performance Expectation Plan. Calef Depo 95.

On February 23, 2004, the new "doctor's excuse" was faxed to Steve Hickman. Ex 49.

On February 24, 2004, Mr. Hickman telephoned the terminal.  In a conference call with Mr. Ryan

and Ms. Calef, Mr. Hickman told Ms. Calef to: (1) Call "TOPS" to **report off work until**

**further notice**;" (2) she would be receiving STD (Short Term Disability) and FMLA (Family

Medical Leave Act) applications; (3) the "Reasonable Accommodation Checklist" and the "work

restrictions from her doctors were being reviewed by the company;" and, (4) she was "to **stay**

**home until Kyle or I called her with additional instructions**." (Emphasis added) Ex 56.  As Ms. Calef was performing her job, Ms. Calef asked "Why am I being sent home?" Ex 56; Calef Depo. 159 & 133.

The "Reasonable Accommodation Checklist," to which Mr. Hickman made reference, is a FedEx interactive form.  The form lists the reasonable accommodations Ms. Calef requested in the course of the process to which she was subjected. Ex 57. This form was never completed by Mr. Hickman.  Mr. Hickman failed, contrary to usual FedEx policy, to forward the form to the FedEx EEO office. Lyle Depo 75.  Despite telephone calls from Ms. Calef, neither Mr. Ryan nor Mr. Hickman ever got back to her with "further instructions."  Ex. 7.  Moreover, after Ms. Calef was barred from the terminal, Mr. Hickman continued to pad the file with purported employee complaints.  Ex 58.

Ms. Calef contacted TOPS for STD and FMLA, as instructed.  TOPS was a FedEx hotline to GatesMacDonald, a company which performed "case management and claims administrative services only, for FedEx."  Ex 59.  As the ERISA Plan Administrator, FedEx had the sole authority and discretion for the "determination of entitlement to benefits and payment of benefits." Ex 59.  Consistent with the GatesMcDonald disclaimer, a review of computer windows, produced in the case at bar, reveals that it was the FedEx Human Resources Department (HR) which found Ms. Calef unable to work as a Service Manager. *See* e.g: Ex 60.[14]

On March 8, 2004, Ms. Calef's treating physician forwarded a FedEx form entitled "Attending Physician Statement of Disability." Ex 61.  In this form, Brad Hall, MD, advised that

---

[14]Each computer window references the "HR" decision to certify, e.g: "DX hand contusion . . . cert case from 2/25/04 through 4/23/04 ** HR." Ex 60.

Ms. Calef was not to lift greater than 20 pounds and that as a "restriction or accommodation" Ms. Calef "must wear a [half] cast." Ex 61.  Despite these minor limitations, the FedEx HR continued Ms. Calef on disability without any effort to accommodate her.

On June 3, 2004, the FedEx HR forwarded a job description to GatesMcDonald for submission to Dr. Hall. Ex 62.  The job description was for a Service Manager II position, rather than Ms. Calef's Service Manager III position.  The job description, forwarded to Dr. Hall, indicated that a Service Manager II must be able to "lift and/or carry up to 25 pounds," an exertional requirement that exceeded, by 5 pounds, the 20 pound limit placed on Ms. Calef. Ex 63.  As the job description presented an exertional requirement greater than 20 pounds, and as it was clear after four months that FedEx was not going to permit Ms. Calef to return to work with any limitation, whatsoever, Dr. Hall acquiesced and declared Ms. Calef totally disabled from FedEx work Ex 64.   Moreover, on August 9, 2004, Dr. Hall requested a functional capacity evaluation in accordance with the FedEx Plan. Ex 65  Gates/McDonald, in turn, requested the same of FedEx. Ex 66. FedEx apparently did not respond to this request.

On July 17, 2004, FedEx sent Ms. Calef an application for Long Term Disability (LTD) benefits under the FedEx Ground Plan it administered (Ex 67; Ex 68; Calef 8 & 46) and for which the Hartford Insurance Company had issued a policy. Ex 69.  The disability coverage under the plan was two tiered.  Under the first tier, an applicant must be disabled from "performing one or more of the essential duties of [her] occupation." Ex 70.

The application for FedEx LTD benefits includes an "Employer's Statement." Ex 71.  No doubt mindful that Hartford, having underwritten a policy would be reticent to see benefits paid unless absolutely necessary, FedEx submitted an "Employer's Statement," signed by Kyle Ryan,

16

which avers that in her job as a Service Manager III, contrary to all job descriptions of record, including those created post suit, Ms. Calef was required to lift and/or carry 75 pounds in her FedEx work. Ex 71.  Based upon this 75 pound lifting requirement, a vocational analyst concluded that Ms. Calef could not perform the job of Service Manager II because, even though classified as light work in the Dictionary of Occupational Titles (DOT) and, therefore, the national economy, the "Employer's Statement" raised the job duties to heavy rendering it beyond accommodation for Ms. Calef. Accordingly, the analyst erroneously concluded that Ms. Calef could not perform her FedEx job. Ex 72.

The FedEx LTD Plan required Ms. Calef to apply for Social Security Disability. Calef Depo 186.  In her application, Ms. Calef listed all of the onerous job duties to which she had been subjected while employed as a Service Manager III, under Mr. Ryan. Ex. 73.  The Social Security Administration denied her application opining that: "we realize that your condition prevents you from doing your past job as a van driver....[but] it does not prevent you from doing other less demanding work."  Ex 74.  Ms. Calef was, of course, a was a FedEx management employee, not a van driver.

By letter dated March 27, 2006, Ms. Calef was denied second tier LTD benefits.  In support of this denial, Hartford opined that Ms. Calef's inability to lift greater than 20 pounds did not prevent her from performing "the essential duties of [her] own occupation" as a FedEx Service Manager. Ex 75.

Before she was approved for first tier LTD benefits, Ms. Calef contacted the FedEx EEO office concerning the treatment she received.  Ms. Calef spoke with Carolyn Lyle, the Senior Manager of the FedEx EEO office.  After speaking with Ms. Calef and receiving notes and

documentation from her, Ms. Lyle e-mailed Steve Hickman on December 17, 2004 and asked for explanations.  Ex 76. [15]  Mr. Hickman sent a handwritten response on the request and documentation to Ms. Lyle.  In addition, Ms. Lyle telephoned Mr. Hickman, on more than one occasion, and discussed Ms. Calef's complaint.

After speaking with Mr. Hickman, Ms. Lyle: "didn't get the sense that our processes were being followed or well understood . . . I recall being very concerned about this."  Lyle Depo 81-82.  Ms. Lyle was concerned that Ms. Calef "was being treated [as she was] because they perceived [her] as disabled .. . Because according to Tammy, she felt as if the human resource manager, Steve Hickman, and the managing director, Scott Burns, were trying to get her to quit."  Lyle depo 74.  Moreover, on December 7, 2004, Ms. Lyle contacted the FedEx legal division regarding Ms. Calef's complaint. Lyle Depo 104.  According to Ms. Lyle, "cases that were violations of our policy were <u>always</u> sent to legal."  Lyle Depo. 48.  By contrast, if no violation was found, Ms. Lyle simply notified the complainant and the respondent. Lyle Depo. 48.

## II. ARGUMENT

### A. The Summary Judgment Standard

Summary judgment is only appropriate if "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The movant bears the burden of showing the absence of any material fact issues.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Summary judgment "should be granted <u>only</u> in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to

---

[15]The Hickman response, as produced by the Defendants, was altered.  Ex 63-A.  The majority of Mr. Hickman's responses to Ms. Lyle were perspicuously "whited out."  Ms. Calef subsequently demanded production of the original Lyle file and discovered the spoliation.  Ex. 77 (FXG/Calef 400)

clarify the application of the law." (Emphasis added) <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir.1979).  All such facts and their inferences must be viewed in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

"The substantive law will identify which facts are material." <u>Anderson v Liberty Lobby</u>, 477 US 242, 248.  "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 US at 249. "[A] trial judge must bear in mind the actual quantum and quality of proof necessary to support" the non-moving party's claim. <u>Anderson</u>, 477 US at 254.

In a diversity case, such as the one at bar, this Court should ask, in connection with the substantive law aspects of the mixed issues of substance and procedure under Rule 56, whether the outcome would be different in federal court from state court? *See e.g.*, <u>Gasperini v Center for Humanities, Inc.</u>, 415 US 415, 428 (1996). Accordingly, the Court should bear in mind that under West Virginia law, in most discrimination cases, once a plaintiff's allegations and evidence create a *prima facie* case, unless the defendant's proffered nondiscriminatory reason is one which no rational trier of fact could reject, the conflict between plaintiff's *prima facie* case and the defendant's proffered nondiscriminatory reason is a jury question.  Cleckley Davis and Palmer, LITIGATION HANDBOOK ON WEST VIRGINIA RULES OF CIVIL PROCEDURE, (2nd ed.) §56(c)[e], *citing* <u>Hanlon v Chambers</u>, 464 SE2d 741 (W.Va. 1995); <u>Barefoot v Sundale Nursing Home</u>, 457 SE2d 152 (W.Va. 1995).

**B. Although Ms. Calef's Demotion Claim is Not Actionable it is Relevant <u>Morgan</u> Evidence.**

Defendant has known, since at least December 15, 2006, that Ms. Calef would not pursue

damages in connection with her demotion from Terminal Manager.  Defendant was advised of

this fact in the Clifford Hawley, PhD expert economist report.  In this report, Dr. Hawley

informed that he re-calculated Ms. Calef's economic damages as counsel informed him that

damages associated with her demotion were not recoverable. Ex 78.  Therefore, Defendant knew

long before filing its dispositive motion that its argument was moot.

Nonetheless, Ms. Calef's demotion is relevant to the issue of discriminatory animus,

because of sex.  National RR Passenger Corp., v Morgan, 122 S.Ct. 2061, 2072 (2002) (nor does

the statute bar an employee from using the prior acts as background evidence in support of a

timely claim).  Accordingly, Ms. Calef recited facts associated with the discriminatory demotion

in her Complaint.  Moreover, contrary to the Defendant's footnoted claims, Mr. Hickman was

necessarily charged by a federally mandated affirmative action program to hire women.

Accordingly, it is a jury question as to whether sex discrimination was a motivating factor in the

actionable adverse employment decision made in the case at bar.

**C. Contrary to Defendant's Arguments, Ms. Calef is a Protected Person with a Disability Under the HRA Because Defendant Regarded Her as Disabled**

The West Virginia Human Rights Act (HRA) affords protection "not only to persons who

actually have substantially liming impairments, but also to persons who . . . are regarded as

having such impairments." Stone v St. Joseph's Hosp., 583 SE2d 389, 399 (W.Va. 2000).  The

HRA's implementing regulations have refined the "regarded as" definition to include an

"impairment that **_does not_** substantially limit major life activities **but is treated by** another as

being such a limitation"(emphasis added) Stone, 583 SE2d at 399; *citing* 77 WVCSR 1-2.8.[16]

---

[16]These regulations interpret 1989 amendments to the HRA which expanded its protections
beyond "only [those] persons with actual substantially limiting impairments" to  "persons who did not
actually have significantly limiting impairments, but who were regarded, perceived, or treated as having a

Accordingly, the HRA's "disability" definition is far broader than that "set out" by the Defendant. *See* Defendant Memo 12.

Moreover, this broader definition establishes that West Virginia's disability discrimination law, "as created by our Legislature and as applied by our courts and administrative agencies, represents an independent approach to the law of disability discrimination that is **not** mechanically tied to federal disability discrimination jurisprudence." Stone, 583 SE2d at 404.[17] Consistent with that "independent approach," and the HRA's broader scope, the Stone Court specifically rejected the federal "exclusion-from-only-one-job rationale" which denies protected status to persons whose limitations prevent performance of tasks only associated with their own-one-job, rather than rendering such persons totally disabled from all jobs. Stone, 583 SE2d at 400-404; 401, n. 16. Accordingly, Defendant's recitation to Forisi v Bowen, 794 F2d 931 (4th Cir. 1986), Toyota Motor Mfg. Ky., Inc. v Williams, 534 US 184 (2002) and similar cases, is of no moment to the issues presented by Ms. Calef's HRA disability discrimination cause of action.

The Stone Court rejected the federal "exclusion-from-only-one-job rationale" for barring protection to individuals whose limitations rendered them unable to perform only tasks associated with their own job because the "exclusion-from-only-one-job rationale" was inconsistent with the purpose of protecting individuals from unfair and arbitrary treatment at the hands of their employers:

---

disability." *See* Stone, 538 SE2d at 399. **Under the pre-1989 HRA** and its "persons with actual significantly limiting impairments only " definition of handicap (disability), the West Virginia Court stated that it would require strict construction of the definition of a person with a handicap (disability). *See* Stone, 399, n. 13. However, even under the pre-1989 statute, the Court found the class of individuals protected to be broader than under federal law. Stone, 399, n. 13.

[17]For a very brief and incomplete survey of just some of West Virginia's divergences from federal jurisprudence, *see* Stone 538 SE2d at 399 n.13 & 404, n. 21.

> If a person is prohibited from establishing threshold "protected status" as a person with a disability within the meaning of the law, an employer may inflict any sort of (otherwise legal) discriminatory conditions or acts on the person – no matter how unfair, arbitrary, stereotyped, bigoted, or unrelated to business necessity that those acts or conditions may be – and the person will have no standing to complain of or remedy the discrimination.

Stone, 538 SE2d at 389.   Thus, the Court concluded that the statutory and regulatory definition of "disability" should be applied so as to ensure its protections to persons upon whom employers had inflicted some form of unfair, arbitrary, stereotyped, or bigoted treatment even though such persons might be able to perform some kind of employment other than their own. As a consequence, Defendant's argument, notwithstanding, it is apparent that the West Virginia Court does not view the HRA's "disability" definition as some "significant hurdle" or bar to invocation of the Act's prohibitions against employment discrimination, on the basis of disability. *See* Defendant Memo, 12, *citing* Sutton v United Airlines, Inc., 527 US 471 (1999).

The *Stone* plaintiff, in two work related injuries, sustained minor sprains to his back in the course of lifting. In both instances, after being seen by an emergency room doctor, he was released to return to work.  After the second back injury, his employer involuntarily removed him from all of his regular job duties.  The employer then placed the *Stone* plaintiff on light-duty, pending an independent medical examination of his back. Stone, 583 SE2d at 393.  "Mr. Stone strongly objected to the [light-duty] transfer, stating that it was unnecessary, unfair, and unreasonable. He said that he had no work limitations or impairments."  Stone, 583 SE2d at 393.

After reviewing the above referenced facts, the Court concluded that Mr. Stone was a person with a disability within the meaning of the HRA.  The Court found Mr. Stone to be a person with a disability because he was "treated [by his employer] as being substantially limited in the major life activity of working." Stone, 538 SE2d at 406.

22

In the instant case, Ms. Calef is a person with a disability within the meaning of the HRA. Ms. Calef satisfies the HRA disability definition because she has an "impairment that **does not** substantially limit major life activities **but is treated by another as being such a limitation**." 77 WVCSR 1-2.8. Ms. Calef's limitation is that she cannot lift greater than 20 pounds and has limited use of her left arm.  The Defendant has offered no medical testimony or evidence to refute the existence of, the duration of, or the extent of this limitation.

Ms. Calef was regarded as disabled by the Defendant because she, like the *Stone* plaintiff, was involuntarily removed from all of her regular job duties.  However, unlike the *Stone* plaintiff, Ms. Calef was not temporarily removed from her job pending the outcome of an independent medical examination.  **Instead, the Defendant continues to deny her a return to work, unless and until she has no restrictions, whatsoever.** Defendant Memo 5.  Accordingly, the Defendant necessarily perceived Ms. Calef as totally disabled from her job, with or without accommodation, because it ordered her home on leave. Moreover, the Defendant continues to hold Ms. Calef in the limbo of this unpaid leave where she neither works nor accrues salary or benefits.  In addition, contrary to the Defendant's claims in its memorandum, Mr. Hickman did not write to Ms. Calef so as to advise that he understood she would be able to return to work at the end of the month. Rather Mr. Hickman wrote so as to falsely[18] inform Ms. Calef that her FMLA leave would end within eight days and that as she could not be released to return to work until after that date, her reinstatement would be subject to "business conditions." Ex 79.

The Defendant further avers that it did not regard Ms. Calef as being "substantially limited in any respect" because it  "put [Ms. Calef] on leave to heal, such was the impression of

---

[18]Ms. Calef's FMLA did not actually end until July 21, 2004 because she was not placed on such leave until, April 29, 2004. Ex 80.

her hand injury as being a temporary condition." Defendant Memo 15.  However, this statement
as to the subjective motivation behind the Defendant's conduct is of no moment, under the HRA.
Initially, the question of whether a person was "discriminatorily treated as having a substantially
limiting impairment . . . is an objective test that does not focus on the subjective motivation
behind the behavior in question, but on the behavior itself." Stone, 538 SE2d at 407, n. 25.  In
addition, the HRA's protections extend to individuals who are unable to perform their work
because of temporary or short term limitations.  Stone, 538 SE2d at 404, n. 21, *citing* Haynes v
Rhone-Poulenc, 521 SE2d 331(W.Va. 1999).  Thus, regardless of whether the Defendant
believed Ms. Calef's impairment was only temporary, it barred Ms. Calef from the work place
and directed her to apply for both STD and FMLA.  In so doing the Defendant necessarily
regarded her, at least temporarily, as substantially limited in the major life activity of working.

Moreover, from a purely factual stand point, the evidence of record calls into question the
credibility of the Defendant's claimed state of mind.  It was the Defendant, not some "outside
unaffiliated outside administrator,"which barred Ms. Calef from her work. *See* Defendant Memo,
15.  In addition, as is made clear by the GatesMcDonald disclaimer, it was the Defendant, as the
ERISA Plan Administrator, which had the sole authority and discretion to determine Ms. Calef's
eligibility for and receipt of disability benefits, not GatesMcDonald.  Accordingly, it was the
Defendant which declared her unable to perform the "essential duties" of her job. Moreover, a
review of the evidence establishes that the FedEx HR Department actually found Ms. Calef
unable to work as a Service Manager III.  Furthermore, Ms. Calef was found eligible for the
Hartford STD benefits only because the Defendant falsely claimed she was required to lift 75
pounds as a Service Manager III.

24

The foregoing demonstrates that the Defendant's claimed right to summary judgment is without support in West Virginia law.  Moreover, the credible evidence of record gives rise to the conclusion that the Defendant, quite simply, unlawfully and discriminatorily treated Ms. Calef as a person with a substantially limiting impairment, in violation of the HRA.

**D. Ms. Calef was Able and Competent to Perform Her Job.**

When the Defendant barred her from its work place, Ms. Calef was a Service Manager III assigned to P&D duties.  The job description for this position includes no lifting requirements and the DOT classifies the job as sedentary.  Neither the Service Manager III job description nor the DOT description includes the duties and functions of a delivery van driver.  Moreover, an internal FedEx memorandum reveals that a "service manager should not be out delivering in the first place," with the possible exception of Christmas peak.  Defendant admits the only tasks Ms. Calef could not perform were to lift 25 pounds on a regular basis [and] deliver packages. Defendant Memo 17-18. Accordingly, the only tasks Ms. Calef could not perform when she was banned from the work place were not included within her job description.

When Ms. Calef was switched from her Dock duties to P&D, she was required to sign a PEP.  Under this plan, the only job duties identified were: (1) conduct two contractor service rides each week, to be reviewed with contractors within two days of each such ride; (2) complete an accident report for any accident on the day of the accident, perform a post-accident ride with the contractor on the following day, and submit a report to Mr. Ryan; (3) complete one Driver Release Audit per quarter for each contractor, meet with each contractor to review the audit and submit a summary of the meeting and results to Mr. Ryan; and (4) complete Van Service Audits for all contractors and temporary drivers each day and provide a summary to Mr. Ryan.  Ms.

Calef performed these essential functions of her job without accommodation.

The final paragraph of the PEP is a catchall which provides that Ms. Calef should complete other duties and functions as assigned by Senior Management.[19]  The catchall is not such as to allow the Defendant to engraft functions of a delivery van driver onto Ms. Calef's job.

Moreover, assuming *arguendo* that Ms. Calef, in fact, needed accommodation in order to fulfill the essential functions of her job, the Defendant's averments notwithstanding, under the HRA, she was not required to request accommodation.  Rather once the Defendant either "knew or should have known of [Ms. Calef's] needs and of the accommodation," the [Defendant] was under an affirmative duty to provide the same." Skaggs v Elk Run Coal Co., Inc., 479 SE2d 561 (W.Va. 1996).  In the case *subjudice*, Defendant admits that it knew Ms. Calef  was having problems driving and making deliveries because of her hand injury.  Defendant further admits that it received requested doctors excuses in which it was advised that Ms. Calef was to limit her driving, not lift greater than 20 pounds and not to use her left arm.  Defendant's Memo 3-4. Under circumstances such as these, the Defendant had a clear HRA duty to accommodate.

Finally, Stone informs that the West Virginia Supreme Court of Appeals requires an employer to provide reasonable accommodation to a "regarded as disabled" employee.  First the Court began its analysis as to whether the *Stone* plaintiff was a protected person under the HRA with reference to Skaggs: and explained, in relevant part, that "**to state a claim for breach of the**

---

[19]Under the doctrine of ***ejusdem generis***, "[w]here general words are used in a contract after specific terms, the general words will be limited in their meaning or restricted to things of like kind and nature with those specified." Change, Inc. v Westfield Insurance Co., 542 SE2d 475, 478 (W.Va. 2000). Applying this standard rule of contract construction to the catch all contained within the Performance Expectation Plan, Ms. Calef and the defendant's agreement regarding the scope of Ms. Calef's job duties, precludes its enlargement so as to include lifting and carrying greater than 20 pound, driving a FedEx delivery van and the delivery of packages.

**duty to reasonably accommodate** under the [HRA] a plaintiff must allege that [he] "is a qualified *person with a disability*." (emphasis added) Stone, 538 SE2d at 389. As discussed, *supra*, the Court held that the Stone plaintiff was a qualified person with a disability because he was "regarded as disabled" by his employer.  Second, despite this holding, the Court, nonetheless, additionally held that: under the HRA, "when undertaken in a good-faith fashion *that is consistent with the duty of reasonable accommodation*, the use of a light duty program or assignment does not establish disability discrimination." (emphasis added) Stone, 538 SE2d at 398.  If there were no duty to accommodate a "regarded as disabled" employee, the Court, in Stone, would not logically have considered the question of the reasonableness of the light-duty assignment with reference to its satisfaction of the duty of reasonable accommodation.

Furthermore, the Court's pronounced worry that unfair, arbitrary, stereotyped, or bigoted, discriminatory employment conditions or acts might go without redress is an indication that when squarely faced with the question of whether reasonable accommodation must be made for "regarded as disabled" employees, it will join the First, Third, Tenth and Eleventh Circuit in requiring the same.  *See, e.g.*, Katz v City Metal Co.,Inc., 87 F.3d 26 (1st Cir. 1996); Williams v Philadelphia Housing Authority Police Department, 380 F.3d 751 (3rd Cir. 2004); Kelly v. Metalics West, Inc., 410 F.3d 670 (10th Cir. 2005); D'Angelo v Conagra Foods, Inc., 422 F.3d 1220 (11th Cir. 2005).  These courts have all concluded that requiring reasonable accommodation for "regarded as disabled" employees is consistent both with the purpose and the plain meaning of the ADA: "as all would agree, the statutory text of the ADA does not in any way 'distinguish between [actually] disabled and 'regarded as' individuals in requiring accommodation." Williams, 380 F.3d at 774. Similarly, requiring such accommodation is consistent with the plain

language of the HRA.

Under the HRA, employment discrimination is prohibited against persons with disabilities: "No person shall, *on the basis of disability*, subject *any qualified person with a disability* to discrimination in employment." 77 CSR 1-4.1. As explained in <u>Stone</u> the definition of a person with a disability includes persons with an "impairment that does not substantially limit major life activities but is treated by another as being such a limitation." <u>Stone</u>, 538 SE2d at 399. Moreover, the HRA requires an employer to provide reasonable accommodation to such persons:

> Reasonable accommodation requires that an employer make reasonable modifications or adjustments designed as attempts to enable *an individual with a disability* to remain in the position for which he/she was hired.

77 CSR 1-4.4. Therefore, pursuant to the HRA and its implementing regulations, the Defendant was required to make reasonable accommodation, as Ms. Calef is an individual with a disability under the HRA. In the instant case, one such reasonable accommodation would have been to return Ms. Calef to Dock duties.

In <u>Skaggs</u>, the Court condoned shuff[ling] job assignments between employees as an accommodation. <u>Skaggs</u>, 479 SE2d at 579. In the instant case, Ms. Calef and Mr. Davis' duties had previously been "shuffled." Accordingly, Defendant need only have effectuated the shuffle, once again, in order to accommodate Ms. Calef.

**E. Ms. Calef is Not Judicially Estopped By Way of Her SSA Disability Application.**

In <u>Cleveland v Policy Management Systems Corp.</u>, 526 US 795, 797 (1999), the Court held that "pursuit, and receipt of SSDI benefits does not automatically estop the recipient from pursing an ADA claim." Rather, the plaintiff need only "explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous

job, at least with 'reasonable accommodation.'" Cleveland, 526 US at 798.

Ms. Calef applied for SSDI benefits because of the Defendant's LTD Plan requirements. With reference to job duties, the application for those benefits asks "What did you do all day?" The application seeks neither the actual job description nor the job's essential functions. Nor does it consider whether reasonable accommodations might be made. Accordingly, Ms. Calef listed all of the onerous tasks she was required to perform because Mr. Ryan made her deliver packages. Based upon these tasks the SSA erroneously concluded that Ms. Calef was a van driver.

As for Ms. Calef's description in the SSDI application of the pain she experienced; it is consistent with her limitations. Moreover, Ms. Calef has repeatedly advised that she is able to perform all of the essential functions of her job as a Service Manager III, despite her limitations. And the Defendant offers no expert testimony with which to refute Ms. Calef.

**F. The Adverse Employment Decisions Made by the Defendant Between October 2003 and January 2004 Give Rise to an Inference of Sex Discrimination.**

As explained, *supra*, an employee may use prior acts of discriminatory employment actions as evidence in support of a timely discrimination claim. Morgan, 122 S.Ct. at 2072. Consistent with Morgan, Ms. Calef proves the requisite sex discriminatory animus by pointing to all the employment decisions made between October 2003 and February 2004.

On October 28, 2003, Ms. Calef was demoted after only six months. The purported rationales for the demotion were: (1) the terminal was not fully contracted; (2) the terminal's service was below goal; and, (3) the terminal's financials were negative. However, Ms. Calef's male replacement, Kyle Ryan, was not demoted in six months even though: (1) the terminal was not fully contracted; (2) the terminal's service was below goal; and, (3) the terminal's financials were negative.

Moreover, when Ms. Calef was switched from the Dock to P&D, as a Service Manager III, she was required to sign a PEP, purportedly because of the change in position.  However, although Mr. Davis, with whom Ms. Calef shared the Service Manger job duties, switched positions from P&D to Dock, he was not required to sign a PEP. This comparitor evidence *prima facially* establishes, a rebuttable presumption of sex discrimination.  Skaggs, 479 SE2d at 581.

In addition, after Ms. Calef was switched from Dock to P&D and ordered to deliver packages, Mr. Hickman came to her and asked whether she was ready to resign.  Given the prior adverse employment actions, comparitor performance, and Mr. Hickman's apparent efforts to evoke Ms. Calef's voluntary resignation, a reasonable jury could properly infer that Mr. Hickman's decision to bar Ms. Calef from the Terminal because of her limitations was mere pretext for sex discrimination.  Moreover, given these facts, a reasonable jury could infer that sex was a motivating factor in all of the Defendant's employment decisions concerning Ms. Calef. Accordingly, the burden is on the Defendant to prove that Mr. Hickman would have barred Ms. Calef from the Terminal in the absence of sex discrimination. See Skaggs, 479 SE2d at 585.

### III. CONCLUSION

For the foregoing reasons, Ms. Calef respectfully asks the Court to deny the Defendant's Motion for Summary Judgment.  Ms. Calef further requests any such other and additional relief as the Court may deem proper in the interests of justice.

Respectfully submitted,
Plaintiff by counsel

_____
Georgia Lee Gates #8547
310 Adams Street
Fairmont, West Virginia 26554
(304) 367-1137
georgialeegates@AOL.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TAMMY L. CALEF,**
       **Plaintiff,**

**V.**                       **CIVIL ACTION NO:  1:06-CV-47**

**FEDEX GROUND PACKAGE SYSTEM, INC.**

       **Defendant.**

### CERTIFICATE OF SERVICE

The undersigned does hereby certify that on the 31st day of May, 2007, the foregoing

**"Memorandum  in Opposition to Defendant's Motion for Summary Judgment"** was

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record:

April Morgan Hincy, Esquire
Eckert Seamans Cherin & Mellott
2400 Cranberry Square
Morgantown, WV  26508-9209
Fax:  304-598-1181
Email:  ahincy @eckertseaman.com

Joseph P. McHugh, Esquire
FedEx Ground Package System, Inc
1000 FedEx Drive
Moon Township, PA  15108
Fax:  412-859-5450
Email:  joseph.mchugh@fedex.com

J. John Myer, Esquire
Christina I. Kepplinger, Esquire
Eckert Seamans Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
Fax:  412-566-6099
Email: jmyers@eckertseaman.com

/s/
Georgia Lee Gates #8547
310 Adams Street
Fairmont, WV  26554
(304) 367-1137
georgialeegates@AOL.com

31